UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

LYSNER VALCIN, JEAN ROBERT SEJOUR, RICHERSON SEJOUR,
CLAUDE SEJOUR, MAX ETIENNE, EMMANUEL MONDESIR, ELIN MEDAR,
RODELIN DEMPAIRE, JEAN FRANCOIS CAJOUR, EDIL EXAINVIL, AROLD
PIERRE, JODANY SEJOUR, MARIE CLAUDETTE MILIEN, JUSLAINE AUGUSTE,
ODETTE ANTIONE, GLADYS GEFFRARD, MANOUCHE SEJOUR, DERDINE
RIODIN, JOCELYNE PIERRE, PLENITA LAURANT, MELIANNA LAZARRE,
ROMELDINE PIERRE, WISLAIN WILSON ORELUS,
JUDES ST. HILAIRE, JIMMY JEAN LOUIS, GESNER ELTA DUVERNEY, ST.
JUSTE SAINTAMAND ORELUS, MIKELSON LACOUR, LALANNE GUERRIER,
NEGUS ALMONOR, OLIBRICE ORELUS, JUMMY MONCOEUR, RONALD JEAN,
BRUNET MARTIN, MODELINE SEJOUR, PAULNISE DOLCE, SLANDLEY
DOLCE, LOGENE PIERRE, THERESE GUERRIER, DUCASSE WALDEX, MARC
AUGUSTE

                          Plaintiffs,

v.                                    CIVIL ACTION NO: 1: 10-cv-00096-SPM-GRJ


STEVEN DAVIS FARMS, LLC AND STEVEN DAVIS

                          Defendants.
————————————————————————————/


**SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY**

**RELIEF**

**PRELIMINARY STATEMENT**

1.  The 41 Plaintiffs came to the United States from Haiti as temporary foreign

    agricultural workers on H-2A visas in 2008.  In Haiti, Defendants' agents

promised the 41 Plaintiffs they would have steady work on a farm in Florida for three (3) years. Defendants through their agents charged Plaintiffs between three thousand ($3,000) each and four thousand five hundred dollars ($4,500 U.S.D.) each in recruitment fees. Somewhere between $123,000 U.S.D. and $184,500 U.S.D was paid in total by Plaintiffs to Defendants' agents in recruitment fees. Plaintiffs, believing the United States to be the land of opportunity and willing to work hard to improve their families' futures, believed the Defendants' agents. Plaintiffs raised the money to pay the Defendants' agents by borrowing money at steep interest rates; some even mortgaged their homes and small parcels of farmland in rural Haiti as security.

2. When Plaintiffs arrived in Florida, Defendants, through their agents, confiscated Plaintiffs' Haitian passports and United States visas. Defendants did not provide Plaintiffs with the promised work and housed them in substandard housing. Defendants warned Plaintiffs they would be arrested and deported if they left their employment. Plaintiffs were fearful of leaving the Defendants' employ, and were bound to continue working to pay off the massive recruitment debt they incurred in order to be hired. None of the Plaintiffs received the amount of work or wages as promised and none have been able to repay their massive recruitment debts.

3. Plaintiffs seek to redress the wrongs they suffered, and bring claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), the Florida Minimum Wage Act, F.S. § 448.101 et. Seq., the Florida Constitution Article X, Section 24, and Florida common law.

4. Plaintiffs seek damages, declaratory relief, injunctive relief, costs of this action,

and other appropriate relief.

5. Plaintiffs have retained the law firm of Florida Rural Legal Services, Inc., to prosecute this case and are requiring the firm to expend time and resources on this matter. Plaintiffs have agreed to permit the firm to seek attorney's fees to the extent permitted by law.

## JURISDICTION AND VENUE

6. This Court has jurisdiction of this matter pursuant to: 28 U.S.C. § 1331 (Federal Question); 28 U.S.C. § 1337 (Interstate Commerce); 29 U.S.C. § 216(b) (FLSA) and 28 U.S.C. § 1367 (Supplemental Jurisdiction). This Court is empowered to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c). Venue is also proper in this district pursuant to 18 U.S.C. § 1965.

## PARTIES

7. Plaintiffs are citizens of Haiti, who came to the United States as temporary agricultural workers (H-2A visas). They were employed by Defendant Steven Davis and Defendant Steven Davis Farms in the production of goods for interstate commerce. At all times, each of the Plaintiffs constituted a person within the meaning of 18 U.S.C. § 1961 (3).

8. Defendant Steven Davis (hereinafter Davis) is the principal owner and chief executive officer of Steven Davis Farms, L.L.C.

9. Davis hired and employed the Plaintiffs as H-2A guest agricultural workers and was and is an employer within the meaning of FLSA, 29 U.S.C. § 203(d) and 20 C.F.R. § 655.100(b).

10. Defendant Steven Davis Farms, L.L.C. (hereafter Davis Farms) is a limited liability corporation duly formed and organized under the laws of the State of Florida.

11. Davis Farms is doing business in La Crosse, Florida, engaged in agricultural and farming operations which employed the Plaintiffs as H-2A guest agricultural workers and is an employer within the meaning of FLSA, 29 U.S.C. § 203(d) and 20 C.F.R. § 655.100(b).

### JURY DEMAND FOR JURY TRIAL

12. Plaintiffs demand a trial by jury on all triable issues.

### STATUTORY AND REGULATORY STRUCTURE

13. An agricultural employer in the United States may bring in foreign workers to perform labor of a temporary nature if the United States Department of Labor certifies that (1) there is an insufficient number of available workers within the United States to perform the job, and (2) the employment of foreign workers will not adversely affect the wages and working conditions of similarly-employed United States workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Aliens admitted to the United States in this fashion are commonly referred to as "H-2A workers".

14. Agricultural employers seeking the admission of H-2A workers must file a temporary labor certification application with the United States Department of Labor. 20 C.F.R. § 655.101(a)(1) and (b)(1), commonly referred to as a "clearance order" or "job order," which includes an offer of employment and is

used in the recruitment of both U.S. and foreign H-2A workers. The "clearance order" under H-2A federal regulations becomes the employment contract of H-2A workers brought into the U.S.

15. As a condition of receiving temporary labor certification for the employment of H-2A workers, agricultural employers are required to comply with applicable H-2A regulations, establishing minimum benefits, wages, and working conditions which must be offered to avoid adversely affecting similarly-employed American workers. 20 C.F.R. §§ 655.0(a)(2) and 655.102(b). Pursuant to H-2A regulations, the employer is required under the H-2A employment clearance order contract to:

   a. Provide housing, without charge and in compliance with the Department of Labor Occupational Safety and Health Administration standards set forth in 29 C.F.R. § 1910.142, for those workers who are not reasonably able to return to their residences within the same day. 20 C.F.R. § 655.102(b)(1) and (b)(1)(i).

   b. Provide each worker with three meals per day, at a limited charge per day, which amount must be stated in the clearance order, or where centralized cooking and eating facilities are not available, to provide such facilities to the workers which will enable them to prepare their own meals, 20 C.F.R. § 655.102(b)(4).

   c. Pay the worker for costs incurred by the worker for daily subsistence and transportation from the place from their home village to the place of employment. 20 C.F.R. § 655.102(b)(5)(i).

d.  Guarantee to offer the worker employment for at least three-fourths of the workdays of the total period during which the work contract is in effect, beginning with the first workday after the arrival of the worker at the place of employment and ending on the expiration date specified in the work contract. If the employer provides the worker with fewer days of employment than required, the employer must pay the worker the amount which the worker would have earned had the worker, in fact, worked for the guaranteed number of days. 20 C.F.R. § 655.102(b)(6)(i).

e.  Keep accurate and adequate records with respect to the workers' earnings, the hours actually worked, and the daily starting and stopping time for the work. 20 C.F.R. § 655.102(b)(7)(i).

f.  Furnish to each worker on each payday a written statement detailing the worker's total earnings, the worker's hourly rate, the hours of employment offered to the worker, the hours actually worked by the worker, an itemization of all deductions made from the worker's wages, and the piece units produced daily. 20 C.F.R. § 655.102(b)(8).

g.  Pay to the worker the highest of the Adverse Effect Wage Rate ($8.82), the federal minimum wage ($5.85), or the state minimum wage ($6.79). 20 C.F.R. § 655.102(b)(9)(i). At all relevant times, the highest wage was the Adverse Effect Wage Rate for Florida at $8.82 per hour.

h.  Make only reasonable deductions and those required by law which the clearance order must specify, but an employer subject to the FLSA may not make any deductions which will result in wage payments of less than

6

the Federal minimum wage required by FLSA. 20 C.F.R. § 655.102(b)(13).

   i. Provide the workers with, a copy of the contract between the employer and the worker, on the day work commences. 20 C.F.R. § 655.102(b)(14).

   j. Comply with applicable federal, state, and local employment-related laws and regulations. 20 C.F.R. § 655.103(b) and 20 C.F.R. § 653.501(d)(2)(xii).

16. The Employment and Training Administration (hereinafter ETA) handbook on H-2A certification contains specific instructions regarding farm labor contractors who file clearance orders for H-2A workers, noting, "the H-2A program and the implementing regulations are primarily constructed for the use of employers who own and/or operate a fixed-site establishment . . . However, . . . . bona fide registered farm labor contractors may be eligible to apply for and receive H-2A certification." ETA Handbook No. 398, II-24 (1988).

17. Farm labor contractors have a history of labor violations and economic insolvency.  Therefore, the ETA Handbook instructs that state job service and ETA staff should "be careful to look behind any applications filed by farm labor contractors" to ensure that the contractor is operating in compliance with the federal statutes regulating farm labor contractors; that: the jobs in the clearance order are genuine; and that "the conditions associated with them comply with applicable laws and regulations." ETA Handbook No. 398, II-25 (1988).

**FACTUAL ALLEGATIONS**

18. Defendant Davis and Defendant Davis Farms produce crops that require an influx of harvest workers for a relatively short period of time each year.

19. Throughout the years Defendant Davis through his business as Defendant Davis Farms has developed a business relationship with several farm labor contractors including Eugene Regis and his family members.

20. Prior to the 2008 north Florida vegetable harvest, Defendants Davis and Davis Farms contracted with Carline Ceneus, Eugene Regis' step-daughter, to furnish his farm with hand-harvesters to pick the vegetable crop.

21. As a result of this agreement, Ceneus submitted to the United States Department of Labor an application for temporary labor certification through her wholly-owned, now defunct corporation, Carline Hot Pickers, Inc.

22. The application sought the admission of 50 temporary foreign workers from Haiti to satisfy Davis Farms' harvest manpower needs.

23. The temporary labor certification application included a job offer, commonly referred to as "clearance order", to be used in the recruitment of both U.S. and foreign workers. The job offer sought 50 workers to perform an anticipated 40 hours of agricultural labor per week on Davis Farms' operations from May 4 through November 28, 2008.  A copy of the clearance order is attached as Exhibit "A".

24. There are three groups of Plaintiffs in this case. There are three groups of the total 41 Plaintiffs; 21 in Group One, 19 in Group Two, and 1 in Group Three.

25.  The first group of Plaintiffs containing twenty-one members is comprised of the following individuals: Lysner Valcin, Jean Robert Sejour, Richerson Sejour,

Claude Sejour, Max Etienne, Emmanuel Mondesir, Elin Medar, Rodelin Dempaire, Jean Francois Cajour, Edil Exainvil, Arold Pierre, Jodany Sejour, Marie Claudette Milien, Juslaine Auguste, Odette Antione, Gladys Geffrard, Manouche Sejour, Derdine Riodin, Jocelyne Pierre, Plenita Laurant, Melianna Lazarre, hereinafter referred to as Group One Plaintiffs, arrived pursuant to the H-2A contract attached as Exhibit "A".

26. The United States Department of Labor approved Ceneus' temporary labor certification application and forwarded it to the United States Consulate in Port-au-Prince for processing of the individual H-2A visas; which were required to permit the Plaintiffs to enter the United States.

27. Pursuant to the temporary labor certification, Ceneus, acting as Davis' and Davis Farms' hiring agent, recruited from April through October of 2008, a number of H-2A workers in Haiti, including the Plaintiffs, to work for Defendant Davis at Defendant Davis Farms during the 2008 harvest season.

28. Defendants Davis and Davis Farms ratified this hiring by employing these Plaintiff H-2A workers during the 2008 vegetable harvest season.

29. Defendants, Davis and Davis Farms, also contracted with Willie Paul Edouard to furnish farmworkers to help in harvesting Davis Farms' 2008 vegetable crop. Edouard submitted an application with the U.S. Department of Labor for the temporary labor certification of the Plaintiffs solicited by him to work at Davis Farms and other farms in the area. The application included a job offer and the clearance order. The United States Department of Labor approved Edouard's

application for temporary labor certification, a copy of which is enclosed marked as Exhibit "B".

30. The second group of 19 Plaintiffs who arrived pursuant to the H-2A contract attached as Exhibit "B" consists of the following individuals; Romeldine Pierre, Wislain Wilson Orelus, Judes St. Hilaire, Jimmy Jean Louis, Gesner Elta Duverney, St. Juste Saintamand Orelus, Mikelson Lacour, Lalanne Guerrier, Negus Almonor, Olibrice Orelus, Jummy Moncoeux, Ronald Jean, Brunet Martin, Paulnise Dolce, Slandley Dolce, Logene Pierre, Marc Auguste, Ducasse Auguste and Therese Guerrier hereinafter referred to as Group Two.

31. The H-2A contract for the Group Two Plaintiffs, lists Larry Rogers and Rogers Farms as the employer who requested H-2A workers (see Exhibit "B"). Despite that fact the "clearance order" lists Rogers Farm as the employer all Group Two Plaintiffs report being recruited by Defendants' agent Carline Ceneus and Willie Paul Edouard. Further all Group Two Plaintiffs report working for Defendants agent Cabioche Bontemps and Defendant himself Steven Davis.

32. Pursuant to the temporary labor certification, Edouard, acting as Davis' and Davis Farms' hiring agent, recruited from September through November of 2008 several H-2A workers in Haiti, including the Plaintiffs, to work at Davis Farms during the 2008 harvest season. Defendants Davis and Davis Farms ratified this hiring by employing these Plaintiff H-2A workers during the 2008 season.

33. The Third Group is Plaintiff Modeline Sejour. Defendants Davis and Davis Farms also contracted with Pierre Avesca to furnish farmworkers to help in harvesting Davis Farms' 2008 vegetable crop. Avesca submitted an application with the U.S.

Department of Labor for the temporary labor certification of the Plaintiffs solicited by him to work at "Kelly Davis Farms". Plaintiff, however, worked for Defendant Davis and Davis Farms. The application included a job offer and the clearance order. The United States Department of Labor approved Avesca's application for temporary labor certification, a copy of which is enclosed marked as Exhibit "C".

34. Pursuant to the temporary labor certification, Avesca, acting as Davis Farms' hiring agent, recruited and hired several H-2A workers in Haiti, including the group three Plaintiff, Modeline Sejour, to work for Davis at Davis Farms during the 2008 Harvest season. Defendants Davis Farms ratified this hiring by employing these Plaintiffs H-2A workers during the 2008 season. Modeline Sejour is the only Plaintiff who has come forward from Group Three.

35. The clearance orders (marked as Exhibits "A", "B", and "C") served as the employment contracts between the various groups of Plaintiffs and Defendants.

36. Plaintiffs in all three groups were recruited in their home villages and in the capital city of Port-au-Prince, Haiti, to work for Defendants in and around Alachua County, Florida, under the terms of the three clearance orders. Plaintiffs accepted Defendants' offers of employment by signing up with Ceneus, Edouard, and Avesca.

37. Plaintiffs paid Defendants' agents a recruitment fee of $3,000 each and, in some cases, as much $4,500 each in order to be included among the group of individuals to be selected as H-2A workers for employment on the operations of Defendant Davis Farms.

38. Some Plaintiffs were told that the fee would be used to pay travel expenses, visas costs, food and lodging expenses while they were in Florida, others were not told how the fee would be used.

39. Defendants' agents advised Plaintiffs in Haiti that they were hired under the terms of their respective H-2A contracts.   Based on Defendants' agents assurances Plaintiffs traveled at their own expense, to the American Consulate in Port-au-Prince, Haiti, to obtain the passports and the H-2A visas required to permit them to enter the United States and be employed by Defendants. While in Port-au-Prince, Plaintiffs, at their own expense, paid the costs of their lodging, meals and other expenses, with the expectation they would be reimbursed for those expenses.

40. Defendants failed to reimburse Plaintiffs for any of their recruitment and travel costs which Plaintiffs incurred from the time they left their homes in Haiti until they reached the Defendants' farm in Alachua County.

41. Plaintiffs were told by Davis' agents not to mention to anyone that they paid a recruitment fee.  Davis' agents informed Plaintiffs that if they told anyone about the recruitment fee they would be unable to travel to the United States to work.

42. Defendants' agents participated in a scheme of manipulation during recruitment in Haiti.  Plaintiffs were told that there was a job available and that they would have to pay a recruitment fee. Many of the Plaintiffs mortgaged their houses and took out loans at interest rates as high as 100% to come to the United States to work for Defendants.   Additionally, several Plaintiffs obtained money from family

members who sold family farmland and livestock to enable them to pay the recruitment fee.

43. Only after Plaintiffs had paid the very steep recruitment fee did Defendants' agents tell Plaintiffs that they were not allowed to mention to anyone that they had paid a recruitment fee.

44. Defendants' agents; Ceneus, Edouard, and Avesca did not provide Plaintiffs with receipts for the recruitment fees they paid.

45. Defendants' agents also provided several of the Plaintiffs with a paper which included a set of questions and answers. Ceneus and Edouard acting as Davis' agents instructed these Plaintiffs to use an "answer sheet" if they were ever questioned about their job. Several of the answers required the Plaintiffs to lie. (attached as Exhibit "D"). At the same time the "answer sheet" Exhibit "D" was passed out, several of the Plaintiffs were told to refer to Ceneus as "Fedna Lugis", a fictitious name assumed by Defendants' agent Carline Ceneus.

46. Plaintiffs traveled from Haiti to the United States and after spending a night in Miami, most were transported to Alachua County to begin working for Defendants.

47. Six Plaintiffs were not transported to Alachua County to work. Plaintiffs, Slandley Dolce, Paulnise Dolce, Logene Pierre, Therese Guerrier, Ducasse Waldex, and Marc Auguste never made it to Defendants' farm to work. Instead, these Plaintiffs were abandoned at the Miami airport when Defendants' agents left them and never returned. These Plaintiffs were lured to the United States on false promises and forced to take out loans at high interest rates in order to become

employed. Only after Defendants' agents ratified Plaintiffs' contracts by bringing Plaintiffs to the United States did Defendants' agents abandon these Plaintiffs at the Miami airport.  These Plaintiffs stranded in a foreign country had no hope of finding the work they were promised in Haiti.

48. Meanwhile, the remaining 35 Plaintiffs arrived in Northern Florida.  Upon arrival in Northern Florida Defendants' agents put Plaintiffs in overcrowded housing and required them to pay between $25 and $40 U.S.D. per week in rent. Defendants' agents either collected the money for Plaintiffs or sometimes they deducted it directly from Plaintiffs' weekly earnings without Plaintiffs' express written consent.

49. Ceneus, Edouard, and Avesca, acting as Defendants agents confiscated nearly all of the Plaintiffs' passports upon arrival in the United States.  Plaintiff, Modeline Sejour, has still not received her passport back from Pierre Avesca or Defendants Davis and Davis Farms.

50. Defendants housed several of the Plaintiffs at the Alamo Hotel in Alachua County. Several Plaintiffs were required to stay as many as five or six people to a room with only two beds to share between them. While Plaintiffs were staying at the Alamo health inspectors reported that health and safety violations existed on the premises.

51. Prior to the arrival of inspectors at the hotel, Defendants' agents told several Plaintiffs to move their luggage into Defendants' agent Ceneus' room so that the inspectors would not see how many individuals were living in each room.

52. The Plaintiffs who were initially housed at the Alamo Hotel were eventually moved. However, Davis' agents had trouble securing housing and eventually turned to Davis himself to find housing at the Timber Village trailer park.

53. Several of the Plaintiffs were forced to share hotel rooms and beds with individuals of the opposite sex because there were not enough rooms available.

54. While living at several different hotels and trailer parks throughout Alachua County, Plaintiffs' freedom of movement was restricted. Defendants' agents repeatedly told Plaintiffs that if they left the premises for any reason they would be immediately deported to Haiti.

55. Plaintiffs were threatened that if they went to the doctor they would be deported.

56. On days when Plaintiffs were too sick to work, Defendants' agent Ceneus forced Plaintiffs into the field by shouting at them and telling them they would be deported if they did not work.

57. While working in the fields Plaintiffs were not provided with sanitation facilities. Toilets and water were only brought to the field on those rare occasions when health inspectors came to visit.

58. Plaintiffs were forced to share water cups because Defendants did not provide adequate drinking cups for each individual plaintiff.

59. Plaintiffs worked in the field picking produce for Defendants Davis and Davis Farms.

60. Defendants' agents picked Plaintiffs up from their housing very early in the morning to transport Plaintiff to the field.

61. Often times Plaintiffs arrived at the field early and were instructed to wait prior to picking the beans.

62. On several occasions, Plaintiffs were required by Defendants, through agents, to wait for up to an hour in the field before they could begin picking. Plaintiffs were not compensated for this time.

63. Plaintiffs were required to stay in the field all day even if there was no work. Plaintiffs were not compensated for this time.

64. On several occasions there were very few beans in the field for Plaintiffs to pick. Plaintiffs were required to stay in the fields despite the lack of work.  Plaintiffs were not compensated for this time.

65. If Plaintiffs complained they were told by the agents of Defendant Davis and Defendant Davis Farms that they would be deported.

66. Plaintiffs were alone in a foreign country with crushing debt back in Haiti and were extremely afraid of reprisal by Defendants Davis and Davis Farms and their agents.

67. Plaintiffs were paid only $3.50 U.S.D per sack of beans, which averaged out to be around $3.50 U.S.D per hour as their compensation from the Defendants.

68. Some of the Plaintiffs were allowed to work in the packing house owned by Defendant Davis and Davis Farms.  Defendants agents' transported Plaintiffs directly from the field where they picked beans to Defendant Davis' packing house.

69. A few of the Plaintiffs were allowed to work in the packing house. The Plaintiffs who were allowed to work in the packing house were told they would be paid $7.00 per hour for the work they performed in the packing house.

70. The Plaintiffs who were not offered work in the packing house were required to sit outside in a hot bus until one of Defendants Davis and Davis Farms agents was ready to leave with the whole group. The Plaintiffs were not compensated for this time.

71. Plaintiffs were paid by Defendants' agents Cabioche Bontemps, Willie P. Edouard, Pierre Avesca, or Carline Ceneus after Defendants gave these agents money for the Plaintiffs' wages.

72. Plaintiff, Manouche Sejour, was required to cook for the other Plaintiffs. She was not compensated for the time she spent preparing the other Plaintiffs' meals.

73. Plaintiffs were not given pay stubs for the hours that they worked. Deductions for housing and food were made from Plaintiffs' pay stubs without explanation or their written consent.

74. Defendants Davis and Davis Farms own the land that Plaintiffs' worked on.

75. Defendants Davis and Davis Farms own the packing house where several of the Group One, Two, and Three Plaintiffs worked.

76. Defendant Davis, in his capacity as owner of Defendant Davis Farms, instructed and showed Plaintiffs how to plant and pick the beans in his field.

77. Defendant Davis was responsible for overseeing the work of the Plaintiffs, and at various times instructed the Plaintiffs how to perform their job duties.

78. Defendant Davis' agents and employees were responsible for transporting Plaintiffs to the field, paying Plaintiffs, and ensuring that Plaintiffs were fed and housed.

79. Defendant Davis instructed his agents where and when the Plaintiffs would work.

80. Defendants violated and breached the terms of Plaintiffs' employment contracts (evidenced by the clearance orders submitted to the United States Department of Labor), and the H-2A regulations incorporated therein, as follows:

a.   Defendants failed to provide Plaintiffs with meal arrangements as promised and as required in the clearance order. Cooking facilities were provided in trailers; however, the hotels were not equipped with cooking facilities. While living in the hotels the workers were charged $5.00 per day and were only provided with a single meal. On several occasions the Plaintiffs would go the entire day without food and would only be served a meal at the end of the day.  While living in the trailers Plaintiffs struggled to find food.  They were occasionally allowed to go to a nearby store to purchase food but many times did not have enough money to do so. Furthermore, during periods when the Plaintiffs had no work they were sold food on credit from a local woman.  Plaintiffs often found it difficult to pay off their credit because their wages were so low.

b.   In part, because of deductions from their wages, Plaintiffs were paid less than the FLSA minimum wage, the Florida minimum wage, and the Adverse Effect Wage Rate for their work on the operations at Defendant Davis Farms.  Defendants withheld sums from Plaintiffs' wages for

housing and food which exceeded the actual cost. Substandard housing quarters in which Plaintiffs resided were provided in violation of federal, state, and local law.

c.   Plaintiffs harvested beans on a piece-rate basis, receiving $3.50 per sack. It took Plaintiffs approximately one hour to pick a sack of beans; thus, Plaintiffs were paid only $3.50 for each hour they spent picking a sack of beans, a wage rate which violated the terms promised in the H-2A contract.

d.   Plaintiffs spent uncompensated time waiting in the fields before and after work.  Once or twice a week Plaintiffs spent a half hour waiting for Defendants' agents instructions that they could start picking.

e.   In the evening Plaintiffs were required to wait without compensation for fellow workers who were working in the packing house. There were not enough positions open for everyone to work in the packing house.

f.   Defendants and their agents did not provide Plaintiffs with pay-stubs or payroll records.

g.   Defendants and their agents did not provide Plaintiffs with a copy of the contract.

h.   Plaintiffs were not paid the three-quarter work guarantee as promised in the contract.

## COUNT I: THE  FAIR LABOR STANDARDS ACT.

81. Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1 through 80 as if set forth in full in this Count I.

82. This Count is asserted by all Group One Plaintiffs, the Group Three Plaintiff, and the following members of Group Two: Romeldine Pierre, Wislain Wilson Orelus, Judes St. Hilaire, Jimmy Jean Louis, Gesner Elta Duverney, St. Juste Saintamand Orelus, Mikelson Lacour, Lalanne Guerrier, Negus Almonor, Olibrice Orelus, Jummy Moncoeux, Ronald Jean, Brunet Martin against all Defendants.

83. At all relevant times, Plaintiffs were employed as agricultural laborers involved in the production of agricultural products, produce, and other goods for sale in interstate commerce, as required under the FLSA, 29 U.S.C. § 203(s)(1)(A).

84. This count sets forth claims under the Fair Labor Standards Act, by Plaintiffs for declaratory relief and damages based upon Defendants' failure to pay minimum wages and reimburse Plaintiffs for recruitment costs, as required by FLSA 29 U.S.C. § 206(a)(1).

85. The violations of the FLSA set forth resulted from the Defendants' failure to reimburse Plaintiffs in the first week of their employment for the expenses they incurred as a result of their travels. As a result, of which, Plaintiffs' first week's earnings fell below the required minimum FLSA hourly wage rate which was then $5.85 per hour.

86. Defendants further violated the FLSA by failing to pay Plaintiffs the required federal minimum wage for each compensable hour they worked in Defendants' employ and by failing to pay the Plaintiffs for all of the time spent waiting to work for the benefit of the employer, and also by failing to supplement Plaintiffs' piece-rate earnings as required by the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), 29 C.F.R. §776.5

87. Plaintiffs first week's earnings fell below the required minimum FLSA hourly wage rate of $5.85 then in effect because of the low piece rate and the illegal deductions. The violations of the FLSA resulted from Defendants' failure to comply with the mandate of *Arriaga v. Florida Pacific Farms L.L.C,* 305 F.3D 1228, (11th Cir. 2002). *Arriaga* requires the employer to reimburse Plaintiffs in the first week of their employment for the expenses they incurred getting from home in Haiti to work in Alachua County, Florida: including the visa reciprocity charges, the visa application fee, and the visa processing fee all of which were incurred primarily for the benefit of the Defendant within the meaning of 29 C.F.R. §§ 531.32(c), 531.35 and *Arriaga.* Defendants' further violated the FLSA by failing to pay Plaintiffs the required federal minimum wage for each compensable hour they worked in Defendants' employ and also failed to supplement Plaintiffs' piece-rate earnings as required by the minimum wage provisions of FLSA, 29 U.S.C. § 206(a), 29 C.F.R. § 776.5.

88. As a result of Defendants' violations of the FLSA,   Plaintiffs are entitled to recover their unpaid minimum wages as well as an equal amount in liquidated damages and attorneys fees, in accordance with 29 U.S.C. § 216(b).

## COUNT II: FLORIDA MINIMUM WAGE AND THE FLORIDA CONSTITUTION

89. Plaintiffs adopt and incorporate by reference, each of the allegations contained in paragraphs 1 through 88, inclusive, as if said allegations were set forth in full in this Count II.

90. This Count is asserted by all Group One Plaintiffs, the Group Three Plaintiff, and the following members of Group Two: Romeldine Pierre, Wislain Wilson Orelus, Judes St. Hilaire, Jimmy Jean Louis, Gesner Elta Duverney, St. Juste Saintamand Orelus, Mikelson Lacour, Lalanne Guerrier, Negus Almonor, Olibrice Orelus, Jummy Moncoeux, Ronald Jean, Brunet Martin against all Defendants.

91. Defendants failed to pay Plaintiffs the required minimum wages for each hour Plaintiffs worked for Defendants in violation of the Florida Minimum Wage Act, Fla. Stat. 448.101, et. seq. and the Florida Constitution Article X, Section 24 which states that; "all working Floridians are entitled to be paid a minimum wage". The Florida minimum wage at the time of these events was $6.79 per hour. Plaintiffs have performed all conditions precedent to filing this action under the Florida Minimum Wage Act in accordance with Fla. Stat. § 448.110(6)(A), but Defendants have failed to pay the total amount of unpaid wages or otherwise resolve the claims to the satisfaction of Plaintiffs.

92. As a consequence of Defendants' violations of the Florida Minimum Wage Act, Fla. Stat. § 448.101 et. seq, and the Florida Constitution Article X, Section 24. Plaintiffs have suffered substantial monetary damages and are entitled to recover the minimum back wages they earned and an equal amount in liquidated damages plus attorneys' fees.

## COUNT III: CONTRACT VIOLATIONS

93. Plaintiffs adopt and incorporate by reference the allegations set forth in paragraphs 1 to 92, inclusive, as if set forth in full in this Count III.

94. This Count is asserted by all Plaintiffs against all Defendants.

95. This Count sets forth a claim for damages and declaratory relief based upon Defendants' breach of the terms of Plaintiffs' H-2A employment contracts as set forth in the clearance order attached hereto and marked Exhibits "A" "B", and "C", under 20 C.F.R. § 655.102(b)(14).

96. Defendants breached the H-2A contract with Plaintiffs by failing to provide and comply with the terms and conditions of employment that are described in the clearance orders (Exhibit "A", "B", "C") including the following:

   a. Failing to pay each Plaintiff on each payday the highest of the Adverse Effect Wage Rage ($8.82 U.S.D.), the federal minimum wage required by FLSA ($5.85) or the state minimum wage rate ($6.79). 20 C.F.R. § 102 (b)(9)(i). At all relevant times, the Florida Adverse Effect Wage Rate was the highest of the three at $8.82.

   b. Failing to provide free housing, without charge and in compliance with the Department of Labor Occupational Safety and Health Administration standards set forth in 29 CFR § 1910.142, to those Plaintiffs who were not reasonably able to return to their residences within the same day. 20 C.F.R. § 655.102(b)(1) and (b)(1)(i).

   c. Failing to provide each Plaintiff with three meals per day, at a charge not to exceed $9.90 per day; or, where centralized cooking and eating facilities were not available, failing to provide such facilities in order to enable them to prepare their own meals. 20 C.F.R. § 655.102(b)(4).

d.   Failing to pay Plaintiffs for the costs incurred by the workers for transportation and daily subsistence from the places from which they had come to work for the Defendants. 20 C.F.R. § 655.102(b)(5)(i).

e.   Failing to provide Plaintiffs with employment for at least three-fourths of the workdays of the total periods during which the work contract was to be in effect, beginning with the first workday after their arrival at the place of employment and ending on the expiration date specified in the clearance order contract. 20 C.F.R. § 655.102(b)(6)(i).

f.   Failing to keep accurate and adequate records with respect to the Plaintiffs' earnings, the hours actually worked by them and the daily starting and stopping time for work. 20 C.F.R. § 655.102(b)(7)(i).

g.   Failing to furnish to each Plaintiff on each payday a written statement detailing their total earnings, their hourly rate, the hours of employment offered them, the hours actually worked by each, an itemization of all deductions made from their wages, and the piece units produced daily. 20 C.F.R. § 655.102(b)(8).

h.   Failing to supplement Plaintiffs' piece-rate earnings so that their earnings, per pay period, were at least equal to the amount they would have earned had they been paid at the appropriate hourly rate. 20 C.F.R. § 655.102(b)(9)(ii)(A).

i.   Failing to make only reasonable deductions and those required by law from Plaintiffs' wages; failing to specify all deductions in the job offer/clearance order; and making deductions which resulted in payments to Plaintiffs of

less than the Federal minimum wage permitted by FLSA. 20 C.F.R. § 655.102(b)(13).

j.  Failing to provide, no later than on the day the work commences, a copy of the contract between the Plaintiffs and the Defendants. 20 C.F.R. § 655.102(b)(14).

k.  Failing to comply with applicable Federal, State, and local employment-related laws and regulations. 20 C.F.R. § 655.103(b) and 20 C.F.R. § 653.501(d)(2)(xii).

97. As a consequence of Defendants' contractual breaches, Plaintiffs have suffered monetary and substantial economic damages and are entitled to recover the Adverse Effect Wage Rage and minimum wages under the FLSA as well as liquidated damages and attorneys' fees and costs.

98. As a result of Defendants' serious breach of their contractual obligations Plaintiffs are entitled to receive payment for all hours promised under the three quarter guaranty.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that judgment be entered in favor of Plaintiffs and against Defendants as follows:

(a)  Declare that Defendants violated the Fair Labor Standards Act as specified in Count I and that judgment be entered in favor of each Plaintiff and against the Defendants for the amount of his\her respective unpaid wages plus an equal amount in liquidated damages, pursuant to 29 U.S.C. § 216 (b) and Fla. Stat. 448.110 (6)(c)(1).

(b) Declare that Defendants violated the Florida Minimum Wage Act as specified in Count II and that judgment be entered in favor of each Plaintiff and against the Defendants in the amount of his or her respective unpaid wages plus an equal amount in liquidated damages pursuant to Fla. Stat. § 448.110(6)(c)(1).

(c) Declare that Defendants violated the provisions of the Federal H-2A Guest Worker Program, 8 U.S.C. § 1101 (a)(15) et. seq. and the regulations issued thereunder; that Defendants breached employment contracts incorporated in the clearance order as set forth in Count III; and that judgment be entered against the Defendants and in favor of each Plaintiff on Plaintiffs' contact claims and awarding each Plaintiff his actual and compensatory damages for Defendants' contractual breaches.

(d) That the judgment to be entered in this case include:

a. The award of all costs accrued during this cause of action.

b. The award of reasonable attorney's fees with regard to the Plaintiffs' claims under the Fair Labor Standards Act as alleged in Count I.

c. The award of reasonable attorneys' fees with regard to Plaintiffs claims for wages due them under the Florida Minimum Wage Act in accordance with Florida Statute §448.08 as alleged in Count II.

    d.  The award of reasonable attorneys' fees with respect to their claims for wages due them at the adverse effect wage rate, in accordance with 20 C.F.R. § 655.102(b)(9)(i) and Fla. Stat. § 448.08.

  (e) Award Plaintiffs such further relief, at law or in equity, as this Court deems just and proper.

This _____ day of _____, 2011.

Respectfully Submitted,

/s/ Amanda Caldwell
Amanda Caldwell
Florida Bar Number 0064237
Florida Rural Legal Services
3210 Cleveland Avenue, Ste. 101
P.O. Box 219
Fort Myers, Florida 33902
Telephone: 239-334-4554, ext. 4112
Fax: 239-334-3042
Email: amanda.caldwell@frls.org

/s/ Ingrid Francoeur
Ingrid Francoeur
Florida Bar Number 0037481
Florida Rural Legal Services
3210 Cleveland Avenue, Ste. 101
P.O. Box 219
Fort Myers, Florida 33902
Telephone: 239-334-4554, ext. 4120
Fax: 239-334-3042
Email: Ingrid.francoeur@frls.org

Attorneys for the Plaintiffs

/s/ CC Abbott
CC Abbott

Florida Bar Number 467065
Florida Rural Legal Services
3210 Cleveland Avenue, Ste. 101
P.O. Box 219
Fort Myers, Florida 33902
Telephone: 239-334-4554, ext. 4118
Fax: 239-334-3042
Email: Colin.abbott@frls.org

Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties involved in this litigation.

*/s/ Amanda M. Caldwell*
Amanda M. Caldwell