# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**CLAUDE SEJOUR,** *et al.***,**

      **Plaintiffs,**

**vs.**                         **CASE NO. 1:10-cv-96-MW/GRJ**

**STEVEN DAVIS FARMS, LLC and
STEVEN M. DAVIS,**

      **Defendants.**

_____/

## ORDER GRANTING H-2A FARMWORKER PLAINTIFFS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter comes before this Court on the motion of twenty-nine (29) H-2A Plaintiffs for Partial Summary Judgment.  ECF No. 134.[1]  In particular all of these Plaintiffs seek partial summary judgment regarding the reimbursement of their transportation and visa expenses under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201-209, and the H-2A regulations, 20 C.F.R. § 655, *et seq.*  Further, a smaller subset of Plaintiffs comprised of Wislain Wilson Orelus, Jimmy Jean-Louis, Gesner Elta Duverny, St. Juste Saintamand Orelus, Mikelson Lacour, Lalanne Guerrier, Negus Almonor, Olibrice Orelus, Ronald Jean, and Brunet Martin (hereinafter "Group II Plaintiffs") as well as Modeline Sejour (hereinafter "Group III Plaintiff") seek

---

[1] As used herein, the term "H-2A farmworkers" refers to Plaintiffs who were employed on temporary visas issued under the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(H)(ii)(A). This group is comprised of the following Plaintiffs: Lysner Valcin, Jean Robert Sejour, Richerson Sejour, Claude Sejour, Emmanuel Mondesir, Elin Medar, Jean Francois Cajour, Edil Exainvil, Arold Pierre, Jodany Sejour, Marie Claudette Milien, Juslaine Auguste, Odette Antione, Gladys Geffrard, Manouche Sejour, Derdine Riodin, Jocelyne Pierre, Plenita Laurent, Wislain Wilson Orelus, Jimmy Jean-Louis, Gesner Elta Duverney, St. Juste Saintamand Orelus, Mikelson Lacour, Lalanne Guerrier, Negus Almonor, Olibrice Orelus, Ronald Jean, Brunet Martin, and Modeline Sejour. Upon order of this Court, this case was consolidated with case 1:10-cv-136-SPM/GRG, an action against the Defendants involving claims by farmworkers who were not employed under the H-2A visa program. This Court will issue a separate order regarding those Plaintiffs.

summary judgment for unpaid wages under the FLSA,  the federal regulations governing the H-2A program, [2] and the Florida Minimum Wage Act, Fla. Stat. § 448.110.

Defendants, Steven Davis ("Davis") & Steven Davis Farms, LLC, acknowledge they did not reimburse Plaintiffs for any of their pre-employment expenses. Defendants contend they are not liable for these sums because Plaintiffs are not covered by the FLSA or the H-2A regulations since they are entitled to various defenses which preclude liability.  Defendants argue they are entitled to an exemption under the FLSA for being a small business with less than 500 man days. Defendants also argue that Plaintiffs are not entitled to reimbursements for their travel and subsistence costs because Plaintiffs did not complete 50% of the contract.  Defendants argue they are exempt from their obligations under the H-2A contract because "an act of God" relieved them of liability.  Finally, Defendants argue they are not liable for these sums because they did not "employ" Plaintiffs within the meaning of the FLSA, the Florida Minimum Wage Act, or the H-2A regulations.

Having reviewed the record and supporting evidence submitted by both parties, this Court finds Defendants are not entitled to a 500 man day exemption under the FLSA because it was not raised as an affirmative defense.  This Court finds Defendants' argument that Plaintiffs are not entitled to transportation and visa expenses because they abandoned the job prior to completing 50% the contract to be inapplicable and not supported by the evidence on the record. Furthermore, this Court finds Defendants' "act of God" defense inapplicable to this case.  The facts support a finding that Defendants are joint employers, along with crew leaders Carline Ceneus ("Ceneus") and Cabioch Bontemps ("Bontemps").  Further, there is no issue of material fact with respect to any of Plaintiffs' claims for reimbursement of transportation and visa

---

[2] The H-2A Plaintiffs have raised additional claims; however, they have agreed to file a motion to voluntarily dismiss the other claims upon this Court's entry of this order.

expenses, nor is there any issue of material fact with respect to the Group II and III Plaintiffs' wage claims.

## FACTUAL SUMMARY

Davis owns and rents land in Alachua County to grow vegetables, and operates Steven Davis Farms, LLC, which owns a packing shed.   Plaintiffs are foreign guest workers who worked under H-2A visas harvesting peas and beans on Davis' farm property, and grading peas and beans in the packing shed.

In early 2008, Davis purchased his packing shed.  Steven Davis Farms, LLC was created to operate the packing shed, with Davis as the principal owner and chief executive officer.  Even though it was intended that the farm, with Davis as sole proprietor, and the packing shed operated by Steven Davis Farms, LLC, would operate separately, the financial accounts of the two are substantially intertwined.  Among other things, the operating expenses for the farm, including the cost of harvesting crops, are paid by Steven Davis Farms, LLC.

Prior to the 2008 season, Davis told Ceneus that he wanted to bring in guest workers under the H-2A visa program to harvest his fields.  Ceneus is a family friend of Davis, who had used her brother, Bontemps, to recruit labor for nearly a decade.  Davis helped Ceneus fill out the H-2A applications, and Ceneus did the "legwork" to obtain H-2A visas for guest workers who would be employed on Davis' operations.  Davis wrote a letter in support of Ceneus' application for foreign labor certification; Ceneus was granted certification and traveled to Haiti to recruit workers for Davis.

In May of 2008, Ceneus traveled with a group of H-2A workers from Haiti to the United States to work at Defendants' farm.  The following Plaintiffs arrived with Ceneus in May of 2008: Lysner Valcin, Jean Robert Sejour, Richerson Sejour, Claude Sejour, Emmanuel

Mondesir, Elin Medar, Jean Francois Cajour, Edil Exainvil, Arold Pierre, Jodany Sejour, Marie Claudette Milien, Juslaine Auguste, Oddette Antione, Gladys Geffrard, Manouche Sejour, Derdine Riodin, Jocelyne Pierre, and Plenita Laurant.   These workers are referred to by the parties as the Group I Plaintiffs.[3]  Shortly after arriving in the United States, Group I Plaintiffs began to work on Davis' farm, and were employed for varying amounts of time from May, 2008, until November, 2008, appearing on Ceneus' payroll records anywhere from eight (8) to eighteen (18) weeks.[4]  While Davis had hired Ceneus to be the farm labor contractor in 2008, she was not always present on the farm.  When Ceneus was not present, her brother, Bontemps, was responsible for supervising the workers.

   In October of 2008, a second group of H-2A workers began working at Davis' farm.  The Group II Plaintiffs are as follow: Jimmy Jean Louis, St. Juste Santamand Orelus, Mikelson Lacoeur, Lalanne Guerrier, Negus Almonor, Olibrice Orelus, Ronald Jean, Brunet Martin, Gesner Duverny, and Wislain Wilson Orelus.  The Group II Plaintiffs were admitted to the United States pursuant to a foreign labor certification application filed on behalf of Puroul Picking.  Plaintiffs were recruited in Haiti by Willy Paul Edouard ("Edouard") and Ceneus.  The foreign labor certification did not list Davis' farming operation as the worksite; however, Plaintiffs worked at Davis' operation under the supervision of Bontemps and Ceneus.

---

[3] Plaintiffs filed a notice of death for Plaintiff Elin Medar on May 12, 2014.  Pursuant to Federal Rule of Civil Procedure 25(a)(1), Plaintiff Medar's heirs will have 90 days from the filing of the notice of death to appoint a personal representative.  A personal representative must be appointed by August 12, 2014.

[4] Group I Plaintiffs are the only H-2A farmworker Plaintiffs whose names appear on the payroll records submitted by Ceneus. Payroll records were submitted by Ceneus and attached to Defendants' response and objection to H-2A Plaintiffs' motion for summary judgment, ECF No. 150-1. With the exception of Plaintiff Gladys Geffrard who only appears on Ceneus' records until July 11, 2008, all Group I Plaintiffs appear on payroll records from at least May 22, 2008, until July 24, 2008.  Plaintiffs Juslaine Auguste, Melianna Lazarre, Marie Claudette Milien, Emmanuel Mondesir, Claude Sejour, Richerson Sejour, and Manouch Sejour appear until July 24, 2008, and not after.  From July 24, 2008, until September 5, 2008, there are no payroll records submitted by Ceneus.  Plaintiffs Jean Francois Cajour, Edil Exainvil, Derdine Riodin, and Edil Exainvil only appear on payroll records until September 19, 2008. Plaintiffs Plenita Laurent, Oddette Antione, Jodany Sejour, Jean Robert Sejour, Arold Pierre, and Elin Medar all appear on Ceneus' payroll records until November 21, 2008.  The Group I Plaintiffs all provided estimates of weeks worked in their affidavits.  Plaintiffs' estimates are similar to the amount of weeks they actually appear on payroll.

Finally, Plaintiff, Modeline Sejour, the sole Group III Plaintiff, arrived as an H-2A worker pursuant to a foreign labor certification application for P.A. Farm Labor Services, having been  recruited in Haiti by Pierre Avesca.  Again, the foreign labor certification did not list Davis' farming operation as the worksite; however, Plaintiff worked at Davis' operation.

## SUMMARY JUDGMENT

A party may be granted summary judgment when "there is no genuine issue as to any material fact… and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   "The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F. 3d 836, 840 (11th Cir. 2000); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In order to defeat a motion for summary judgment, the opposing party must establish that there is a genuine dispute of material fact, and "it must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A fact in dispute is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  The adverse party may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Rice-Lamar*, 232 F.2d at 840.

## DEFENDANTS' COVERAGE UNDER THE FAIR LABOR STANDARDS ACT

Defendants argue they are entitled to claim an exemption under the FLSA, 29 U.S.C. § 213(a)(6)(A), for being a small business with less than 500 man days.  An agricultural employee is exempted from the minimum wage and overtime coverage of the FLSA if the employee works

for an employer who did not use more than 500 man days of agricultural labor during a preceding calendar quarter. 29 U.S.C § 213(a)(6)(A). A man day is defined as "any day during which an employee performs any agricultural labor for not less than one hour." *Centeno-Bernuy v. Becker Farms*, 564 F. Supp. 2d 166, 177 (W.D.N.Y. 2009) (quoting 29 U.S.C. § 203(u)). "The regulations note that '500 man-days is approximately the equivalent of seven employees employed full-time in a calendar quarter.'" *Centeno-Bernuy,* 564 F. Supp. 2d at 177 (citing 29 C.F.R. § 780.305(a)).

Defendants contend that the corporation, Steven Davis Farms, LLC, was not formed until 2008 and could not have had 500 man days during any of the calendar quarters of the previous year.  Defendants also contend there is an issue of fact with respect to Defendant Davis' exemption under the 500 man day provision, arguing that they are entitled to a hearing on whether the exemption exists. However, Defendants failed to raise this exemption as an affirmative defense.

Defendants are not entitled to claim a 500 man day exemption where they did not raise the exemption as an affirmative defense. *Rotondo v. Georgetown,* 869 F. Supp. 369, 373 (D.S.C. 1994) (explaining that "the assertion of an exemption from the mandates of the FLSA is an affirmative defense that is waived if it is not specifically pleaded by a defendant" (citing *Renfro v. City of Emporia,* 741 F. Supp. 887, 888 (D. Kan. 1990), *aff'd,* 948 F.2d 1529, 1539 (10th Cir. 1991)).  Under Rule 8(c) of the Federal Rules of Civil Procedure, a claim of exemption is an affirmative defense that must be specifically pled or it will be deemed waived. *See Morrison v. Exec. Aircraft Refinishing, Inc.*, 434 F. Supp. 2d 1314, 1318-19 (S.D. Fla. 2005). "The general purpose of [Fed. R. Civ. P.] 8(c) is to provide particularized and specific notice of certain defenses." *Renfro v. City of Emporia*, 948 F.2d 1529, 1539 (10th Cir. 1991) (citing *State Distrib.*

*Inc. v. Glenmore Distilleries*, 738 F.2d 405 (10th Cir. 1984)). Defendants are not entitled to claim an exemption because they failed to specifically plead their exemption in their answer. Since Plaintiffs were not given timely notice of Defendants' intention to assert this exemption, to allow Defendants' argument would be unjust and would defy the purpose of the FLSA. Defendants have, therefore, waived the 500 man day exemption defense.

Even if Defendants had not waived their 500 man day exemption, they are not entitled to an exemption because they have not submitted evidence to prove they are entitled to the exemption. This exemption is an affirmative defense and thus Defendants have the burden of establishing the exemption on summary judgment. *See Roca v. Alphatech Aviation Serv. Inc.*, 961 F. Supp. 2d 1234, 1238 (S.D. Fla. 2013); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (noting that when the moving party has the burden of proof at trial, it also has the burden of proof for summary judgment purposes); *Klem v. Cnty. of Santa Clara,* 208 F.3d 1085, 1095 (9th Cir. 2000) (explaining that in a summary judgment motion, "the burden is on [the employer] to demonstrate its entitlement to an exemption from the overtime provisions of the FLSA.").

The FLSA is a broad remedial statute designed to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of the workers." 29 U.S.C. § 202(a). It was designed to "aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945). Accordingly, the FLSA "is to be liberally construed to apply to the furthest reaches consistent with Congressional direction." *Leever v. Carson,* 360 F.3d 1014, 1017 (9th Cir. 2004) (citing Klem, 208 F.3d at 1089).

Exemptions, on the other hand, are disfavored, and not given generous application.  They are to be construed narrowly against the employers asserting them.  *See Auer v. Robbins*, 519 U.S. 452, 462 (1997).

An employer claiming an exemption under the FLSA faces a heightened burden of proof. The employer must do more than merely meet the usual preponderance of evidence standard in order to prevail; he must show that the employee fits "plainly and unmistakably" within the exemption's terms. *Hagadorn v. M.F. Smith & Assoc., Inc.*, 172 F.3d 878, No. 97-1446, 1999 WL 68403, at *2 (10th Cir. Feb. 12, 1999) (unpublished table decision) ("Moreover, the employer's burden is heightened beyond the usual preponderance standard, such that the employer must show that the employee fits 'plainly and unmistakably' within the exemption's terms."); *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960) ("We have held that these exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms or spirit.")

Defendants have not submitted any evidence to show they are entitled to the 500 man day exemption for the relevant year.   Similarly, this Court does not find Defendants' argument that Steven Davis Farms, LLC is automatically entitled to a 500 man day exemption for 2008 compelling.  Ordinarily, a new business would be entitled to the 500 man day exemption automatically if it had no employees during the previous year.  However, this is only true if the new entity is indeed a new entity and not a continuation of a pre-existing employer.  *See, e.g.*, *IUAIW v. Ruiz,* No. B–83–270, 1991 WL 315133, at *5 (S.D. Tex. Jan. 22, 1991) (denying a newly incorporated company the small-business exemption under the AWPA because it was

simply a reconstructed and continuing version of an earlier entity).[5]  Here Steven Davis Farms, LLC never acted independently from Davis in his individual capacity.   As Davis' bookkeeper noted, there was regular comingling of the assets of the individual accounts of Steven Davis Farms, LLC and Davis.  Defendants are not entitled to an exemption where Steven Davis Farms, LLC was an extension of Davis' previous business.

Defendants next argue that the H-2A workers are not entitled to reimbursements for their travel and subsistence costs because Plaintiffs did not complete 50% of the contract, as required by the H-2A program regulations.     This contention is legally misguided.  The federal regulations which govern the H-2A program dictate that an employer shall provide transportation or reimburse the costs of inbound transportation and subsistence en route for any worker who completes 50% of the contract period. 20 C.F.R. § 655 102(b)(5)(i).[6]  Although the regulations only require reimbursement for inbound transportation and subsistence costs after a worker completes 50% of the contract period, to the extent that these expenses reduce the worker's earnings below the minimum wage, the employer is obligated to reimburse those expenses during the first week. *Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1235 (11th Cir. 2002).[7]

Furthermore, Defendants' argument that they are entitled to an exemption under the H-2A regulations because of an "act of God" is inapplicable to Plaintiffs' claims. While the H-2A regulations do mention an "act of God," it is mentioned in conjunction with the employer's ability to terminate the work contract prematurely, not to circumvent payment obligations under

---

[5] Although this case involves the Agricultural Workers' Protection Act (hereinafter "AWPA"), the statute incorporates by reference FLSA's 500 man day exemption in 29 U.S.C. § 1803(a)(2), the jurisprudence relating to the exemption applies equally for both statutes.

[6] The regulation citation changed in 2010; the new citation is 20 C.F.R. § 655.122(h)(l).

[7] *Arriaga* concerned expenditures which could not be credited against the employers' minimum wage obligations under Section 3(m) of the Fair Labor Standards Act, 29 U.S.C. § 203(m), because they were primarily for the benefit of the employer. *Arriaga*, F.3d at 1235-37.  The same section 3(m) principles apply with regard to employer's obligations to pay other legally mandated wages, such as the adverse effect wage rate. *See* Wage and Hour Memorandum No. 99-03, February 11, 1999, at 3.

the FLSA.  For example, if a worker is no longer needed due to fire, weather, or other "act of God" that makes fulfillment of the contract impossible, the employer may terminate the contract but nonetheless fulfill the ¾ guarantee for the period prior to contract termination.  20 C.F.R. § 655.122(o).  However, Defendants' right to terminate the contract due to an "act of God" is not at issue here.  Plaintiffs are demanding compliance with Defendants' minimum wage obligations; these obligations are not excused due to fire, weather, or other "act of God."  Group I Plaintiffs are asking for transportation and visa expenses, and Group II and III Plaintiffs are asking for transportation and visa expenses as well as unpaid wages.  The "act of God" argument proposed by Defendants is not applicable to the expenses and wages claimed by Plaintiffs.

## EMPLOYER STATUS

Plaintiffs claim that Defendants violated the FLSA, the Florida Minimum Wage Act, Fla. Stat. § 448.101 et seq., and the federal H-2A regulations, 20 C.F.R § 655.11 et seq.  Defendants argue they were not "employers" of Plaintiffs under any of these laws.  The FLSA, Florida Minimum Wage Act, and the federal H-2A regulations all contemplate that a worker may be "employed" by more than one employer.  The FLSA imposes obligations on those entities which "employ" workers.  29 U.S.C. §§ 206-207.  Under the FLSA, an entity "employs" an individual if it "suffers or permits" the individual to work. *Id.*; 29 U.S.C. § 203(g).  The Courts have held that the definition of "employ" under the H-2A regulations is similar to the definition provided by the FLSA. *See Guijosa-Silva v. Roberson*, No. 7:10–CV–17 (HL), 2012 WL 860394, *19 (M.D. Ga. Mar. 13, 2012); *see also Hernandez v. Two Bros. Farm, LLC*, 579 F. Supp. 2d 1379, 1383 (S.D. Fla. 2008).  In 2008 the regulations governing the H-2A program defined employer as follows:

Employer means a person, firm, corporation or other association or organization which *suffers or permits* a person to work and (1) which has a location in the United States to

which U.S. workers may be referred for employment, and which proposes to employ
workers at a place within the United States; and (2) which has an employer relationship
with respect to employees under this subpart as indicated by the fact that it may hire, pay,
fire, supervise or otherwise control the work of any such employee.

20 C.F.R. § 600.100(b) (1987) (emphasis added).[8] Therefore, an entity found to employ workers

under the FLSA is also an employer for those workers under the H-2A contracts. In *Guijosa-*

*Silva*, the court explained the relationship as follows:

> Federal regulations defining the employer/employee under H-2A are almost
> identical to the standards set by the FLSA. An H-2A employer is defined as one
> who 'suffers or permits' a person to work. 20 C.F.R. § 655.103(b). Such an
> employer is characterized by his ability to 'hire, pay, fire, supervise or otherwise
> control the work of such employee.' *Id.* These factors are almost identical to the
> factors that are used to determine whether an employer falls within the FLSA
> definitional scope. Therefore the Court deems that, for the same reasons that Sid
> Roberson and W[endel Roberson Farms] are deemed to be 'employers' within the
> context of the FLSA, they are also deemed to be 'employers' under the H-2A
> contracts.

*Guijosa-Silva*, 2012 WL 860394, at *19.

Since this lawsuit began, the Eleventh Circuit has clarified its position with respect to

joint employment.  The court in *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172 (11th Cir.

2012), reviewed the joint employment factors set out in *Aimable v. Long & Scott Farms, Inc.*, 20

F. 3d 434 (11th Cir. 1994).  The *Layton* decision is only binding on non-agricultural cases.  *See*

*Layton*, 686 F.3d at 1175.  *Layton* left undisturbed both *Antenor v. D & S Farms*, 88 F.3d. 925,

932-33 (11th Cir. 1996) and *Charles v. Burton*, 169 F.3d 1322 (11th Cir. 1999), and the

reasoning of those cases continues to govern joint employment situations in agriculture.

Applying two different joint employment tests to members of the same work crew could

lead to incongruous results in this case, with the domestic workers able to recover against the

grower under the principles of *Antenor* and *Charles*, while their H-2A co-workers, under exactly

---

[8] The regulations have since been amended.  The new citation is 20 C.F.R. § 655.103.

the same facts, are perhaps unable to so under *Layton.* Such disparate results would also contravene the purposes of the H-2A agricultural guestworker program. Ceneus was required to submit a job offer, or a clearance order, as part of her temporary labor certification to obtain permission to employ H-2A workers.  This job offer was to be used to recruit both U.S. and H-2A workers. *See* 20 C.F.R. § 655.101(b)(1) (1987).  In this case, the H-2A farmworkers did work alongside domestic farmworkers.  Some of the payroll records submitted by Defendants in their response to summary judgment did, in fact, list domestic farmworker Anite Labrousse as a plaintiff.  SDF Supplement 000291 and 000293 at ECF No. 150-1.  Restricting Defendants' joint employment obligations to only AWPA-covered U.S. workers would create an incentive for employers to hire only H-2A workers instead of domestic workers.  This would run counter to the "obvious point" of the H-2A provisions of the Immigration and Nationality Act: ensuring that U.S. workers are given a preference over foreign workers for jobs in this country. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 596 (1982); *Elton Orchards, Inc. v. Brennan,* 508 F.2d 493, 500 (1st Cir. 1974).

The courts have traditionally applied a multi-factor test set out by the Department of Labor ("DOL") in 29 C.F.R. § 500.20(h)(5)(iv)(A)-(G) to determine if an employer jointly employed its workers.   These regulatory factors provide guidance in determining economic dependence and, ultimately, whether an employment relationship exists.  *Charles*, 169 F.3d at 1328-29.  The courts have applied the same joint employment factors for both H-2A workers and domestic workers. *See generally Luna v. Del Monte Fresh Produce (Southeast), Inc.*, No. 1:06-CV-2000-JEC, 2008 WL 754452 (N.D. Ga. Mar. 19, 2008). In applying these factors, the inquiry is not whether the worker is more economically dependent on one entity than another, with the winner avoiding responsibility as an employer.  Instead, each employment relationship must be

evaluated separately to determine whether the putative employer has suffered or permitted the employee to work. *Antenor,* 88 F.3d at 932-33. Under an analysis of these factors, this Court finds that Davis is a joint employer of the H-2A workers as outlined below.

**1. Davis controlled the work of the farmworkers.**

The first factor identified in the DOL's regulations evaluates whether the agricultural employer has the power, either alone or through control of the farm labor contractor, to direct, control, or supervise the workers or the work performed. 29 C.F.R. § 500.20(h)(5)(iv)(A).

In evaluating control in employment cases, courts evaluate the degree to which the putative employer has the right to control the work of the employee, regardless of whether this power was actually exercised. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 957 (1989). Control may be exercised indirectly as well as directly. "In an agricultural setting, 'the grower is not expected to look over the shoulder of each farmworker every hour of every day. Thus it is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor.'" *Charles*, 169 F.3d at 1330 (citing *Antenor*, 88 F.3d at 935). In evaluating the degree of control exercised by a potential employer, courts will consider "specific indicia of control," such as decisions regarding employment, whom to assign to specific tasks, how to design the management structure, when work should begin on a particular day, whether a worker should be disciplined, whether the agricultural employers were free to delay or stop the workers directly from continuing their work, and whether the agricultural employers could assign work to specific workers indirectly. *Id.* at 1329-31. Courts may also consider factors such as the degree to which the potential employer oversees the activities of the workers and provides direction, and whether the potential employer supplies the workers with the containers upon which piece-rate earnings are based. *Id.*

Davis exceeded the control threshold set forth in *Charles* and *Antenor*.  From the beginning, Davis played an active role in making decisions and overseeing the workers.  He controlled the major stages in the production cycle, such as site preparation, planting, weed control, fertilization, and harvest.  The process started with site preparation which includes land testing.  Davis made all the preparation decisions, including disking the land and soil testing.  After the land was prepared, the planting process began.  Davis made all the decisions regarding when to begin planting and which crops to pick in a particular year.  He planted peas and butter beans, purchased seeds from a broker, and assumed the risk of loss.  After planting, Davis decided when to apply fertilizer, how much to fertilize, and which areas of the field to fertilize.  Davis also decided on the appropriate time to begin plowing and how often to plow.  Davis decided when the crop was ready to begin harvesting, and whether to use machine or manual harvesters to harvest certain crops.

Davis also made important management decisions. Although Bontemps was responsible for bringing Plaintiffs to the farm, it was ultimately Davis who made the decisions regarding when to harvest and what fields Plaintiffs should harvest on a particular day, and whether Bontemps needed to split his crew between the field and the packing shed.

Davis exercised direct supervision and direct control over Plaintiffs.  Davis visited the field several times a day to check on Plaintiffs' progress, and often picked with Plaintiffs, throwing beans into their buckets.  Plaintiffs picked beans and placed them in five gallon buckets, which were furnished and owned by Davis, before emptying the beans into sacks, which were also furnished and owned by Davis. Additionally, Davis instructed the crews (Farmworker Plaintiffs) on how to pick peas, pointing out if some were too young to be picked.  Davis also decided the number of times Plaintiffs were required to pick in a field, and whether Plaintiffs

14

needed to go through the same field two, three, or four times. On certain occasions, Davis

notified a crew leader if a Plaintiff was picking the beans incorrectly.  Davis' control was not

limited to the fieldwork; he also personally oversaw Plaintiffs' work in the packing house.

Based on the numerous examples of control and supervision outlined in the preceding

paragraphs, this Court finds Davis had full control of his farming business.

### 2.  Davis had the power to modify employment conditions and determine pay rates of the workers.

The second factor set in the DOL regulations examines whether the putative employer

has the right to hire or fire workers, modify the workers' employment conditions, or determine

the rates or method of payment.  29 C.F.R. § 500.20(h)(5)(iv)(B).  As with control, the focus is

on the putative employer's power or authority to exercise these functions should it be in its best

interest to do so, regardless of whether this power is ever exercised.  The retention of power is as

revealing of the workers' economic dependence on the putative employer as is actual exercise of

power.  Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. 11,734, 11,740

(Mar. 12, 1997).

Davis exercised a substantial amount of control over hiring and firing decisions,

employment conditions, and rates and methods of payment. Davis directly determined the piece-

rate pay for various types of produce picked at the farm, and determined when to pay Plaintiffs

an hourly rate instead of piece rate. Davis delegated the task of finding a picking crew to harvest

the beans to Bontemps and Ceneus, and therefore indirectly enjoyed the rights to hire, fire, and

modify the employment conditions of the workers.  As mentioned above, Davis prepared the

land, plowed, decided when to fertilize the field, knew the appropriate time to begin planting,

and directed Bontemps to have Plaintiffs harvest the beans on certain dates.  Davis further

exercised his power to modify Plaintiffs' conditions by deciding when Plaintiffs would begin picking, where they would pick, and for how long.

Additionally, Davis, with the assistance of Ceneus, hired H-2A workers for the 2008 season.  Davis found out about the H-2A program through a leadership conference and decided to use the program for the 2008 season and approached Ceneus for assistance.  He helped Ceneus fill out the H-2A applications, and Ceneus did the "legwork" to obtain the H-2A visas for guest workers to work in Davis' fields and packing shed.  Furthermore, Davis wrote a letter to the Department of Labor for Ceneus to be allowed to recruit labor under the H-2A program to work on Davis' farm.  Davis was very involved in the hiring of workers, the employment conditions of workers, and the payment process.

### 3.  The duration of the parties' relationship.

The third factor in the DOL regulation evaluates the degree of permanency and the duration of the relationship of the parties, in the context of the agricultural activity at issue. 29 C.F.R. § 500.20(h)(5)(iv)(C).  Where a labor contractor and its crew are engaged for the duration of the operation and are obligated to work for or be available only to the putative employer at its discretion, this suggests economic dependence. Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,740.   Some courts have considered the duration of the parties' relationship as an issue and have found that "[h]arvesting of crops is a seasonal industry without much permanence beyond the harvesting season.  However temporary the relationship may be . . . the relationship is permanent [if] the migrants work only for [the] defendants during that season."  *Haywood v. Barnes*, 109 F.R.D. 568, 589 (E.D.N.C. 1986) (quoting *Donovan v. Gillmor*, 535 F. Supp. 154, 162 (N.D. Ohio 1982).  Based on this analysis, the H-2A Plaintiffs were economically dependent on Davis.

16

As mentioned above, Davis participated in the H-2A program in 2008.  Group I H-2A Plaintiffs were obligated under contract to work exclusively for Davis for the 2008 beans season. While the Group II and III Plaintiffs were not obligated to work for Davis, they were brought to Davis' farm and worked exclusively for Bontemps, who testified he worked exclusively for Davis.  H-2A workers who are admitted temporarily to the United States to work for a specific employer are isolated by both geography and language, making the permanency of their relationship even more solidified.  The geographic isolation of Plaintiffs in a rural area, the unlikely possibility that the Plaintiffs would have found other work given their limited language ability and knowledge of the area, and the record evidence showing Plaintiffs worked exclusively for Davis all weigh in favor of a finding of permanency and economic dependence.

### 4.  Bean picking is unskilled, rote work.

Another indicator of employment status is the extent to which the services rendered are repetitive or rote tasks requiring little skill. 29 C.F.R. § 500.20(h)(5)(iv)(D).  The lower the worker's skill level, the lower the value and marketability of his services, and the greater likelihood of his economic dependence on the person utilizing these services. Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,740-41. In addition, unskilled jobs, particularly those performed on a piece-rate basis, require less direct supervision. *See Antenor*, 88 F.3d at 935.

Picking and grading beans is extremely simple work.  The job requires no experience and can be learned instantly.  Picking beans is a repetitive and rote task requiring relatively little training; thus, the workers are economically dependent on the employer.  *See Charles*, 169 F.3d at 1332.

**5.   Bean picking is an integral part of Davis overall business.**

The fifth factor set out in the Department of Labor's regulations examines whether the activities performed are an integral part of the overall business of the agricultural employer. 29 C.F.R. § 500.20(h)(5)(iv)(E).   A worker who performs a routine task that is a normal and integral part of the grower's production is likely to be dependent on the grower's overall production.   *See Antenor*, 88 F.3d at 937; *Charles*, 169 F.3d at 1332-33.   Davis testified that harvesting is a crucial step in the process of farming because without harvesting he would not have any produce to sell.   ECF No. 134-1, Exh. 20.   Plaintiffs were therefore dependent on Defendants because harvesting beans is an integral part of Davis' business.

**6.   The work was performed on Davis' premises.**

The sixth factor set out in the Department of Labor's regulations considers whether the work is performed on the premises of the putative employer.   29 C.F.R. § 500.20(h)(5)(iv)(F). This element reveals the worker's dependence on an entity because without the land, the employee might not have work.   In addition, the business owning the land "will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors."   *Antenor*, 88 F.3d at 936-37.   Plaintiffs worked exclusively on Davis' premises.

**7.   Davis undertook responsibilities that are ordinarily performed by employers.**

The final factor identified by DOL evaluates whether the putative employer undertakes responsibilities ordinarily performed by an employer, including preparing payroll records, issuing paychecks, providing workers' compensation insurance or providing field sanitation facilities or tools for use by the workers. 29 C.F.R. § 500.20(h)(5)(iv)(G).   A putative employer voluntarily assuming responsibility for workplace obligations imposed on employers indicates voluntary assumption of employer status for other purposes, and is relevant to whether or not the

employees were economically dependent on the putative employer for a workplace protection or benefit. Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,736. Furthermore, such behavior indicates it is in the interest of the putative employer to perform these functions, rather than to rely on the labor contractor. Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,741.

Federal regulations issued under the Occupational Safety and Health Act (OSHA) require agricultural employers to provide toilets, drinking water, and hand washing facilities at worksites. 29 C.F.R. §1928.110(c).  Davis rented the port-a-potties and sinks for the workers to use in the fields, and provided housing for the workers.  Davis voluntarily assumed the employer status by providing these accommodations and undertaking responsibilities ordinarily performed by an employer.

The analysis of the above factors weighs in favor of a finding that Davis is a joint employer.  Defendants, however, argue that they are not joint employers, relying primarily on the decision in *Aimable v. Long & Scott Farms*, 20 F.3d 434 (11th Cir. 1994).  However, the *Aimable* decision is factually distinguishable from the instant case.  In *Aimable*, the farmer made decisions how many acres to pick but had infrequent oversight over the workers.  *Id.* at 441. The *Aimable* decision involved a case where the crewleader had "absolute, unfettered, and sole control over [the workers] and their employment." *Id.* at 440-41.  Referencing the decision in *Leach v. Johnston*, 812 F. Supp. 1198, 1203, 1207 (M.D. Fla. 1992), the court found "control when the farmer goes beyond general instructions such as how many acres to pick in a given day, and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." *Aimable*, 20 F.3d at 441.

19

Defendants, unlike the farmer in *Aimable*, did exercise direct control and supervision over the workers.  Davis would visit the field several times a day to check on the workers' progress.  He would routinely pick with the workers, throwing beans into their buckets.   Davis also instructed the crews on how to pick peas, telling them if some were too young to be picked. Davis also decided the number of times the workers got to pick in a field and whether the workers needed to go through the same field two, three, or four times.   Additionally, Davis was present in the packing house overseeing the workers.

Furthermore, in *Aimabl*e, the crew leader was responsible for setting compensation.  In the instant case, Davis controlled compensation.   Even if analyzed under the factors set out in *Aimable,* Defendants are joint employers. There is no issue of material fact as to whether Defendants are joint employers.

The last consideration regarding joint employment involves Group II and III Plaintiffs. Defendants have argued that Davis is not the employer of Group II and Group III Plaintiffs who were brought to the United States after being recruited by Willy Paul Edouard and Pierre Avesca. Defendants' main argument with respect to Group II and III Plaintiffs is that Davis' farm was not listed as Plaintiffs' worksite on the work order.  Furthermore, Defendants originally argued that with the exception of two of the Group II Plaintiffs (Wislain Wilson Orelus and Gesner Duverny) none of the Group II Plaintiffs worked on the farm.  Defendants contradicted this argument in their opposition to H-2A plaintiffs' motion for summary judgment and admitted that several of the Group II Plaintiffs did in fact work on the farm under the supervision of Bontemps. Further, two Group II Plaintiffs, Olibrice Orelus and Mickelson Lacour, appeared on a Department of Labor investigation of Davis' operations.  ECF No. 134-42.[9]  Although workers

---

[9] A separate report from the Department of Labor finds that "[b]ased on all available evidence [Willy Paul Edouard] [was] issued an approval by the U.S. Department of Labor, Employment and Training Administration to furnish 60

had the burden to prove they worked on the farm, they satisfied this burden by testifying that they worked for Bontemps. *See Antenor,* 39 F. Supp. 2d at 1378 (noting that pickers can establish that they worked on defendant farm through indirect means short of being able to identify the farmer). Bontemps testified that he worked exclusively for Davis during the 2008 harvest season. ECF No. 131-4, 69. Therefore, the record reflects that Defendants are joint employers with respect to the Group I, Group II, and Group III H-2A Plaintiffs.

**Defendants' Violations of the FLSA and H-2A Regulations**

The H-2A Farmworker Plaintiffs seek summary judgment only on the issues relating to reimbursement of visa and transportation expenses under the FLSA and unpaid wages under the FLSA and Florida Minimum Wage Act for the Group II and III Plaintiffs. Each will be discussed separately.

**Transportation and Visa Expenses**

This Court finds that because Davis was a joint employer along with Ceneus and Bontemps, he was responsible for reimbursing each of the H-2A Plaintiffs' transportation and visa expenses. Each of the H-2A Plaintiffs incurred costs obtaining an H-2A visa and in traveling from Haiti to the United States. Under the FLSA, the Plaintiffs' employers were obligated to reimburse these expenses during the first week of work to the extent that these costs reduced the Plaintiffs' earnings below the FLSA minimum wage. *See Arriaga v. Fla. Pac. Farms, LLC,* 305 F.3d. 1228, 1241-44 (11th Cir. 2002); *Moreno-Espinosa v. J & J AG Prods., Inc.* 247 F.R.D. 686, 689 (S.D. Fla. 2007) ("[U]nder the 11th Circuit case law workers must be reimbursed for pre-employment expenses in the first week of employment."). Plaintiffs were entitled to receive wages at least equal to the adverse effect wage rate for their labor: the wage

H-2A workers to Larry Rogers. Facts indicate that you actually recruited and furnished these workers to Cabioch Bontemps, an unregistered farm labor contractor. Mr. Bontemps then provided these workers to Steve(n) [sic] Davis Farms, LLC. ECF No. 188-2.

level that Defendants should have exceeded during Plaintiffs first week of work after accounting

for the visa and transportation costs. 20 C.F.R. § 655.102(b)(9)(i). *See also Avila-Gonzalez v.*

*Barajas*, No. 2:04CV567-FTM-33DNF, 2006 WL 643297, at *2 (M.D. Fla. Mar. 2, 2006).

However, because of the expenses they incurred in obtaining and traveling to the job, the

Plaintiffs arrived at the jobsite "in the hole."  These expenses were never reimbursed by the

Defendants.  *See Arriaga*, 305 F.3d at 1237. The undisputed record evidence reflects that the

following expenses were incurred by the Plaintiffs primarily for the benefit of Davis, none of

which were reimbursed:

- *Visa Application fee.* Like Plaintiffs in *Arriaga,* Plaintiffs were required to pay $131 for
  the issuance of a visa once the application was approved. 22 C.F.R. § 22.1.

- *Travel from Port au Prince to Miami.*  The workers were required to travel from Port au
  Prince to Miami, Florida, in order to secure employment in the United States.  The cost of
  the plane ticket was $405.70.  ECF No.134-45.

Defendants did not dispute this evidence and because Davis employed the H-2A

Plaintiffs within the meaning of the FLSA and the H-2A regulations, Davis was jointly and

severely responsible for these reimbursements, along with Ceneus.[10]

Defendants have not presented any issues of material fact with respect to the cost paid by

Plaintiffs for transportation and visa expenses.  In fact, Defendants' own payroll records *do not*

indicate that Plaintiffs were reimbursed for their transportation and visa costs.  (SDF SUPP Bates

# 000116-000117 at ECF No. 150-1).  Transportation costs are typically paid by the employer.

---

[10] The H-2A Plaintiffs previously argued that there was no issue of fact with respect to the Group II and III workers receiving their recruitment or travel expenses. That argument was based on Defendants' almost blanket denial that Group II and III workers ever worked on the farm. Defendants admitted, however, that several Group II and III workers were present at the farm in their Opposition to H-2A Plaintiffs' Motion for Summary Judgment.  Despite that admission, Defendants have not submitted names or payroll records to challenge Group II Plaintiffs' affidavits. Thus, there is no longer an issue of fact with respect to these workers.

*Arriaga*, 305 F.3d at 1241-44.

Calculations for the Group I Plaintiffs' transportation and visa fee reimbursements are calculated using hours from the payroll records submitted by Defendants.  There are no payroll records present for the Group II or III Plaintiffs; however, these Plaintiffs have submitted estimates which have not been rebutted by Defendants.  This Court finds that all the H-2A Plaintiffs are entitled to reimbursement of their travel and visa expenses.

**Unpaid Wages for Group II  and III H-2A Plaintiffs**

The Group II and III H-2A Plaintiffs have established through their testimony and Affidavits that they worked for Bontemps during the 2008 season.  Bontemps testified on the record that he worked exclusively for Steven Davis Farms in 2008.  The Plaintiffs have met their burden in proving they have worked on Davis' farm and have provided affidavits indicating the length of the time they worked at Davis' farm and the hours they worked during the 2008 harvesting season.

In order to prove a violation of the FLSA, an employee bears the initial burden of proving that he performed work for which he was not properly compensated.  *Anderson v. Mt.Clemons Pottery Co.,* 328 U.S. 680 (1946).  In *Anderson*, the Supreme Court explained the burden as follows:

> [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference drawn from the employees' evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee even though the result be only approximate.

*Anderson*, 328 U.S. at 686-88.

Courts must accept evidence submitted by plaintiffs as the "most accurate basis possible under the circumstances," and are required to draw all reasonable inferences in Plaintiffs' favor. *Id.* at 688-693.  Plaintiffs have submitted estimates of time they worked at Davis' farm, including time spent waiting for Davis' fields to dry before they were able to start picking.  Under the FLSA, "[c]ompensable hours worked . . . include time during which employees are required to be present at the worksite." *Birdwell v. Gadsden*, 970 F.2d 802, 807 (11th Cir. 1992). *See also Fields v. Luther*, No. JH–84–1875, 1988 WL 59963, at *15 (D. Md. May 4, 1988) (finding that time spent in fields waiting for the dew to dry is compensable under the FLSA); *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1269, 1290 (M.D. Fla. 1999); *Vega v. Gasper,* 886 F. Supp. 1335, 1338-40 (W.D. Tex. 1995) (finding farmworkers entitled to be paid from when they arrive at the field until they departed).

Because Defendants have offered no pay records with respect to these Plaintiffs, this Court accepts Plaintiffs' estimates.  *See, e.g., Reeves v. Int'l Tel. & Tel. Corp.,* 616 F.2d 1342, 1352 (5th Cir. 1980) (affirming judgment for the plaintiff where "totals corresponded to the rough computations of his subconscious mind"); *Marshall v. Mammas Fried Chicken, Inc.,* 590 F.2d 598, 599 (5th Cir. 1979) (reversing district court's rejection of "reconstructed employee hours" where some had been shown to be "inaccurate" because "[a]lthough the evidence was not perfectly accurate, it provided a sufficient basis to calculate the number of hours worked by each employee."); *Olivas v. A Little Havana Check Cash, Inc.,* 324 Fed. Appx. 839, 844 (11th Cir. 2009) (rejecting an employer's complaint that damages "lack[ed] sufficient precision" where "[employer] did not present any evidence as to the amount of work [plaintiff] performed or to rebut her [damages]" and affirming damage award although plaintiff "admitted [her calculations] were inaccurate.").

Although Defendants argue that Group II Plaintiffs were paid in full by Bontemps, Defendants have not submitted any evidence to support this assertion. Ceneus' declaration does not mention any of the Group II or III Plaintiffs.  Likewise, Bontemps' declaration does not refer to the Group II or III Plaintiffs.  Defendant Davis, as a joint employer for Group II and III Plaintiffs, had an obligation to pay workers their wages.  *See Maldonado v. Lucca*, 629 F. Supp. 483, 486 (D.N.J. 1986); *Maldonado v. Lucca*, 636 F. Supp. 621, 626 (D.N.J. 1986) (holding farmer liable when crew leader absconded without paying the crew).  Plaintiffs are entitled to receive lost wages up to the adverse effect wage rate, which was $8.82 in 2008, and liquidated damages up to the Florida minimum wage. Plaintiffs are entitled to receive wages at least equal to the adverse effect wage rate for their labor. 20 C.F.R. § 655.102(b)(9)(i).

This Court expressly determines that there is no reason for delay and expressly directs the entry of judgment as set out in this order.  *See* Fed. R. Civ. P. 54(4).  This is particularly true where, as here, counsel has indicated that Plaintiffs are likely to abandon the balance of their claims.  In any event, unless and until Plaintiffs voluntarily dismiss the balance of their claims, the case will go forward on all remaining claims.  Moreover, Plaintiffs may apply for an award of attorney's fees and costs in light of this judgment.

For these reasons,

IT IS ORDERED:

The H-2A Farmworker Plaintiffs' Motion for Partial Summary Judgment, ECF No. 134, is **GRANTED.**  The Clerk shall enter judgment in favor of the H-2A Farmworker Plaintiffs against Defendants, Steven M. Davis and Steven Davis Farms, LLC, jointly and severally, for transportation and visa reimbursements for each H-2A Plaintiff in the amount of $21,294.49, and

judgment in the amount of $39,131.88, for wage damages for Group II and Group III Plaintiffs,

for total judgment in the amount of $60,426.37.[11]

More specifically, the Clerk shall enter judgment as follows:

**JUDGMENT FOR PLAINTIFFS FOR RECRUITMENT AND TRAVEL EXPENSE DAMAGES:**

| Name of Plaintiff | Amount of Judgment |
|---|---|
| Oddette Antoine | $  507.84 |
| Juslaine Auguste | 483.34 |
| Jean Francois Cajour | 493.84 |
| Edil Exainvil | 507.84 |
| Gladys Geffrard | 521.84 |
| Plenita Laurent | 521.84 |
| Elin Medar      (deceased) | 476.34 |
| Marie Claudette Milien | 500.84 |
| Emmanuel Mondesir | 497.84 |
| Arold Pierre | 423.84 |
| Jocelyne Pierre | 486.84 |
| Derdine Riodin | 514.84 |
| Claude Sejour | 493.84 |
| Richerson Sejour | 511.34 |
| Jean Robert Sejour | 423.84 |
| Jodany Sejour | 493.84 |
| Manouche Sejour | 581.34 |

---

[11] For a detailed description of the amounts due each H-2A Plaintiff, see attached Addendum.

| | |
|---|---|
| Lysner Valcin | 469.34 |
| Wislain Wilson Orelus | 1,011.23 |
| Jimmy Jean-Louis | 810.24 |
| Genser Elta Duverney | 1,382.85 |
| St. Juste Saintamand Orelus | 1,276.75 |
| Mikelson Lacour | 930.95 |
| Lalanne Guerrier | 1,249.70 |
| Negus Almoner | 1,462.85 |
| Olibrice Orelus | 1,011.23 |
| Ronald Jean | 1,080.89 |
| Brunet Martin | 1,277.63 |
| Modeline Sejour | 889.55 |
| **Total Recruitment & Travel Expenses** | **$21,294.49** |

**JUDGMENT FOR PLAINTIFFS FOR WAGE DAMAGES:**

| Name of Plaintiff | Amount of Judgment |
|---|---|
| Wislain Wilson | $3,276.16 |
| Jimmy Jean-Louis | 483.91 |
| Gesner Elta Duverney | 5,916.20 |
| St. Juste Saintamand Orelus | 5,044.96 |
| Mikelson Lacour | 2,010.60 |
| Lalanne Guerier | 3,130.10 |
| Negus Almonor | 4,317.15 |
| Olibrice Orelus | 3,276.16 |

| | |
|---|---|
| Ronald Jean | 4,185.24 |
| Brunet Martin | 7,367.44 |
| Modeline Sejour | 123.96 |
| Total Wage Damages: | **$39,131.88** |

**SO ORDERED on July 1, 2014.**

**s/Mark E. Walker**
**United States District Judge**

## ADDENDUM

## TABLE A: RECRUITMENT AND TRAVEL EXPENSE DAMAGES GROUP I PLAINTIFFS

**Amount Owed** = Estimated Wages Earned + Pay Received During First Week + Visa and Plane – Actual Wages Paid.

**Estimated wages due** = Hours on payroll records (ECF No. 150-1, at 31-35) multiplied by the AEWR of $8.82. Plaintiffs are entitled to $8.82 per hour under the precedent in *Arriaga. Arriaga* concerned expenditures which could not be credited against the employers' minimum wage obligations under Section 3(m) of the Fair Labor Standards Act, 29 U.S.C. § 203(m), because they were primarily for the benefit of the employer. *Arriaga*, F.3d at 1235-37.  These same section 3(m) principles apply with regard to employer's obligations to pay other legally-mandated wages, such as the adverse effect wage rate. *See* Wage and Hour Memorandum No. 99-03, February 11, 1999, at 3.

**Actual Wages Paid =** Hours reported as paid on Defendants' payroll records week ending May 30, 2014.


**Oddette Antoine**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $245.00 | $507.84 |

**Juslaine Auguste**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Pid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $269.50 | $483.34 |

**Jean Francois Cajour**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $259.00 | $493.84 |

**Edil Exainvil**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $245.00 | $507.84 |

**Gladys Geffrard**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $231.00 | $521.84 |

**Plenita Laurent**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $231.00 | $521.84 |

**Elin Medar**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $276.50 | $476.34 |
| *Plaintiff has passed away. *See Notice of Death (D.E. 134)* | | | |

**Marie Claudette Milien**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $252.00 | $500.84 |

**Emmanuel Mondesir**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $255.00 | $497.84 |

**Arold Pierre**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $329.00 | $423.84 |

**Jocelyne Pierre**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $266.00 | $486.84 |

**Derdine Riodin**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $238.00 | $514.84 |

**Claude Sejour**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $259.00 | $493.84 |

**Richerson Sejour**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $241.50 | $511.34 |

**Jean Robert Sejour**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $329.00 | $423.84 |

**Jodany Sejour**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $259.00 | $493.84 |

**Manouche Sejour**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $171.50 | $581.34 |

**Lysner Valcin**

| Estimated Wages Earned During First Work Week – Based on Payroll Records | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $216.09 | $536.75 | $283.50 | $469.34 |

For a total of **$8,910.62** for the Group I Plaintiffs' reimbursement for transportation and visa expenses.[12]

<u>**Damages for Reimbursement of Travel and Visa Expenses for Group II and III Plaintiffs**</u>

**Amount Owed** = Estimated Wages Earned + Transportation (Visa and Plane) – Actual Wages Paid.

**Estimated wages due** = Plaintiffs' own estimations multiplied by 2008 adverse effect wage rage of $8.82.

---

[12] Plaintiff Elin Medar is deceased. His damages are included in the $21,294.49 judgment. However, should a personal representative not be appointed by August 12, 2014, this Court will consider his claim void and the judgment reduced accordingly.

**Actual Wages Paid =** Clients' estimations of wages paid during 1st work week.

**Wislain Wilson Orelus**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $564.48 | $536.75 | $90.00 | $1,011.23 |

**Jimmy Jean-Louis**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| 273.49 | $536.75 | $0.00 | $810.24 |

**Genser Elta Duverney**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| 926.10 | $536.75 | $80.00 | $1382.85 |

**St.Juste Saintamand Orelus**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| 740.88 | $536.75 | $0.00 | $1,276.75 |

**Mikelson Lacour**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $529.2 | $536.75 | $135.00 | $930.95 |

**Lalanne Guerrier**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| 712.95 | $536.75 | $0.00 | $1249.70 |

**Negus Almonor**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| 926.10 | $536.75 | $0.00 | $1,462.85 |

**Olibrice Orelus**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $564.48 | $536.75 | $90.00 | $1,011.23 |

**Ronald Jean**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $679.14 | $536.75 | $135.00 | $1,080.89 |

**Brunet Martin**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $740.88 | $536.75 | $0.00 | $1,277.63 |

## GROUP III

**Modeline Sejour**

| Estimated Wages Earned During First Work Week | Amount Paid for Plane Ticket and Visa Processing | Actual Wages Paid | Amount Owed |
|---|---|---|---|
| $352.8 | $536.75 | $0.00 | $889.55 |

 For a total of **$12,383.87** in Transportation and visa expense reimbursement for Group II and III workers.


## TABLE B GROUP II and III PLAINTIFFS WAGE DAMAGES

**Hours Worked = Based on Plaintiffs' estimations**

**Estimated H-2A Wages Earned = Plaintiffs estimations of hours multiplied by the adverse effect wage rate of $8.82**

**Actual Amount Paid = Plaintiffs' estimation of amount paid**

**Unpaid H-2A Wages = Estimated H-2A Wages – Actual Amount Paid**

**Estimated Minimum Wage Earned = Plaintiffs estimation of hours x 2008 Florida minimum wage of $6.79**

**Total Wage Damages = Unpaid H-2A Wages + Unpaid Minimum Wage**

**Wilsain Wilson Orelus**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---|---|---|---|---|---|---|---|
| 2008 | 256 | $2257.92 | $360.00 | $1897.92 | $869.12 | $1897.92 | $3276.16 |

**Jimmy Jean-Louis**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---|---|---|---|---|---|---|---|
| 2008 | 31 | $273.42 | $0.00 | $273.42 | $210.49 | $210.49 | $483.91 |

**Gesner Elta Duverney**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---|---|---|---|---|---|---|---|
| 2008 | 420 | $3704.40 | $320.00 | $3384.40 | $2851.80 | $2531.80 | $5916.20 |

**St. Juste Saintamand Orelus**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---|---|---|---|---|---|---|---|
| 2008 | 216 | $1905.12 | $540.00 | $1365.12 | $1557.36 | $1017.36 | $5044.96 |

**Mikelson Lacour**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---|---|---|---|---|---|---|---|
| 2008 | 180 | $1587.60 | $405.00 | $1182.60 | $1233.00 | $828.00 | $2010.60 |

**Lalanne Guerrier**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---------|--------------|------------------------------|--------------------|-------------------|-------------------------------|---------------------|------------------------------------------------|
| 2008 | 120 | $1058.40 | $270.00 | $788.40 | $865.20 | $595.20 | $3130.10 |

**Negus Almonor**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---------|--------------|------------------------------|--------------------|-------------------|-------------------------------|---------------------|------------------------------------------------|
| 2008 | 315 | $2778.30 | $300.00 | $2478.30 | $2138.85 | $1838.85 | $4317.15 |

**Olibrice Orelus**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---------|--------------|------------------------------|--------------------|-------------------|-------------------------------|---------------------|------------------------------------------------|
| 2008 | 256 | $2257.92 | $360.00 | $1897.92 | $1303.68 | $1378.24 | $3276.16 |

**Ronald Jean**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---------|--------------|------------------------------|--------------------|-------------------|-------------------------------|---------------------|------------------------------------------------|
| 2008 | 462 | $4074.84 | $810 | $3264.84 | $1730.40 | $920.4 | $4185.24 |

**Brunet Martin**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---------|--------------|------------------------------|--------------------|-------------------|-------------------------------|---------------------|------------------------------------------------|
| 2008 | 504 | $4445.28 | $250.00 | $4195.28 | $3422.16 | $3172.16 | $7367.44 |

## GROUP III WAGE DAMAGES

**Modeline Sejour**

| Harvest | Hours Worked | Estimated H-2A Wages Earned | Actual Amount Paid | Unpaid H-2A Wages | Estimated Minimum Wage Earned | Unpaid Minimum Wage | Total Wage Damages (offered + Fla. Liquidated) |
|---------|--------------|------------------------------|--------------------|-------------------|-------------------------------|---------------------|------------------------------------------------|
| 2008 | 40 | $352.80 | $250.00 | $102.8 | $271.6 | $21.16 | $123.96 |

For a total of **$39,131.88** in Group II and III wage damages.

*